The last case on the calendar for today is number 21-1263, KLS Diversified Master Fund v. McDevitt. Thank you so much. Mr. Sussing. May it please the court, Christopher Sussing, Woods-Smith Heading & Berman for Appellant Sean McDevitt. We respectfully request that this court reverse the lower court's decision on grounds that the loan at issue violates New York's usury laws and should be void ab initio. Alternatively, should this court not find that loan to be void in violation of New York's usury laws, the lower court should still be reversed on grounds that Judge Lyman improbably made a number of factual determinations which would be best left for the jury and therefore summary judgment granting was improper as a matter of law. With respect to unconscionability, two weeks ago, this court reaffirmed that a corporate loan that is below $2.5 million that exceeds an annual interest rate of 25% violates New York's usury laws and is a void and unenforceable. Here in January 2017, Appellee loaned Appellant's company $2 million. That note, the agreement, was within two years the loan was to be repaid at $3.3 million plus interest. In the two years, that amount between the $2 million loan and the $3.3 million plus interest repayment clearly on its face exceeds 25% interest and on its face violates New York's usury laws. Am I correct, Counselor, that you didn't raise the criminal usurious argument below? And if I am correct on that, can you tell me why we should hear it now? We raised unconscionability below, Your Honor. And while we didn't specifically raise the criminal usurious nature of that loan, this court in the crime matter reaffirmed that this court can hear matters of purely legal argument that don't require any factual analysis that weren't raised on appeal or if it's to avoid manifest injustice. So why would this be manifestly unjust in this situation? It's not like your client has perfectly clean hands in all of this. It would be manifestly unjust because it violates New York's usury laws. So you're saying per se, a violation of the law that we should find as a matter of law that a per se violation is unjust? 100%. Well, in this case, the repayment date was accelerated, right? So the company defaulted and didn't pay and they foreclosed on the company's assets and then three months later filed suit against Mr. McDevitt personally because he had a conditional guarantee. We can talk about the conditional guarantee, but the date on which the loan became due was due to the counterparty's conduct, to Sensei's default, right? Well, it was due by January of 2019. I understand, but that's actually not – it didn't operate to get to the maturity date. What happened was there was a default and therefore the whole thing became due, right? The whole thing became due by the maturity date. This all happened around the same time Mr. McDevitt was fired as CEO. They put a new CEO in, and it was all – frankly, the sooner that that accelerated, so the sooner – whether it was a year into the loan, that would actually be a larger interest rate if they were looking for the $3.6 million. Well, this happens all the time that there are some events that allow a loan to accelerate, right? Certainly, but if you're looking at the value of what was lent and then what was needed to be repaid, that on its face exceeds 25% interest. That's the amount, I see. Yeah. Okay, why don't you address the question about whether this report was all factual issues? Certainly, Your Honor. As mentioned, Mr. McDevitt entered into a conditional guarantee and warranted that he would be personally liable for the $2 million loan to his company if certain recourse events occurred. And here, arguably, the recourse events required some sort of determination of materiality, whether it was material breach of the agreement or intent on the part of Mr. McDevitt. On every single ground, Judge Lyman made determinations of fact, which this Court, in process America, respectfully should have been determined that should have been left for the jury. In process America, this Court identified a number of factors that should be weighed in terms of the materiality of a breach, including the absolute relative magnitude of default, its effect on the contract's purpose, and the willfulness. Here, look at the grounds that plaintiff, I'm sorry, that appellee was seeking to hold Mr. McDevitt personally liable. Nondisclosure of a lawsuit at some point during the pendency of the loan. There are a couple ones, right? There's the nondisclosure of the Porter Wright threatened lawsuit. There's the nondisclosure of the lawsuit after it happened. And there's the nondisclosure of the Schwartz lawsuit, and there are the taxes. Correct. So, in the Porter Wright one, what is the factual issue, or the first one, the nondisclosure, the misrepresentation of, like, the nondisclosure of the threat? What is the argument that there was a factual question about Mr. McDevitt's intent? The idea was, well, he didn't think it was a real threat? Is that the argument? Well, the question was twofold. One is whether the intent of not disclosing that information during or prior to the actual loan transaction was a violation of the agreement. Or whether the litigation arose after the closing of the transaction. Yeah, I understand. So what did the district court resolve that should have been left to the jury? The district court said as a matter of law that not disclosing a $35,000 potential liability against the company was a breach of this agreement. Which, according to Judge Lyman, would require – It's not just the liability against the company. It's also the $100,000 something against him, right? He was obligated to disclose lawsuits against officers. Well, correct, Your Honor, but if you look at each recourse event, it needs to be analyzed on its own merits. I kind of thought what you might say was he got that letter threatening the lawsuit a year and three months before the agreement, and maybe he just didn't think it was serious. Is that possible? Well, that's what we argued in lower court, and Judge Lyman disregarded that, that a year and a half prior when there was an email that said within seven days if you don't respond, we're suing you. A year and a half goes by. He didn't disregard. He just didn't – he wasn't persuaded, right? I mean, what instead he looked at was the provision of the litigation, which doesn't have, like, any sort of intent requirement, or it just said company's knowledge currently threatened, and he argued that your client knew that it at least had been threatened. Is that correct? Right. He argued that that was sufficient in constitutive breach, but then the question is, again, in terms of materiality of that. So not talking about a lawsuit, which ultimately the company only ended up paying $15,000, that requires default on a $3.3 million loan that the company used for its ongoing operations, for its employees, for research and development, that that should be automatically turned off. The idea that you're pointing back to the amount seems to me suggesting that we're kind of back into the unconscionability land. I'm sorry? The idea that you're suggesting that the amount – the way you phrased it suggested that maybe you thought it was unreasonable to void the contract on the basis of a small liability, and that seems to me to put us back in unconscionability land. Is that what you're trying to do? And maybe – and I apologize if that's what I came across. It's more of an analyze of materiality of this, material breach, not saying – I thought what you were saying a moment ago is that it's not an intentional misrepresentation if he actually thought it wasn't a real threatened lawsuit. Correct. So that's one part of it. It's just that it's not intentional because he didn't think it was real. And even if it was – Because somebody made an empty threat of a lawsuit. Correct. Like if I bump into somebody on the street and says, hey, I'm going to sue you, maybe – I guess technically maybe the contract would obligate me to disclose that, but it seems weird to void the contract because of that. That's exactly our position. And I guess you also are saying that there's some kind of materiality. I mean, you're talking about the guarantee, the conditional guarantee agreement. If we were talking about a breach of contract to say he violated the agreement by doing an intentional misrepresentation, there would be a materiality requirement. And I guess you're suggesting we should understand a guarantee agreement in a similar way? Correct. It should be treated the same way in terms of materiality of the breach of contract. I mean, we do have case law to say that we strictly construe these things, right, and we give inferences on behalf of the guarantor. And maybe that's the way – if it's ambiguous as to whether something really amounts to a violation, we might indulge that assumption. Correct. Correct. And it's important to keep in mind this is a conditional guarantee. It's not an absolute guarantee. So these conditions need to be met. And as a matter of law, according to both Judge Liman's position and Appellee's position, frankly, any – the mere fact of default is a condition or not payment is a condition. It does away with this actually being a conditional guarantee and forces personal liability on Mr. McDevitt, which now he's facing a judgment of excess of $5 million. Well, that's not exactly how his argument worked, right? So his argument – he did look to the recourse events that are in the conditional guarantee agreement. Correct. And he said – and it says if there's a material breach of the agreement, right? Correct. And Judge Liman did find that. His determination was that there were material breaches of the agreement, and arguably those should have been left for the jury. So why isn't the failure to report the Porter Wright lawsuit after it happened a material breach? Because that did not have any effect as a magnitude on the ongoing concern of the company. Now, think about this. $2 million was loaned to the company. What's happened now in the course of the underlying litigation is that there are thousands of documents exchanged in discovery, and what Appellee has done is now looked at every single instance now they can try to get that money back. That's creating now a pretext for what should have been in existence at the time that they brought the lawsuit. Whereas, again, the magnitude of that – I think you're saying that if – when KLS found out about the lawsuit, they should have accelerated the loan at that point, if it really was material? Is that the idea? No, it's more the fact that they didn't truly – well, that's an interesting point, because if they didn't – if they truly felt that was a material breach, they didn't tell Mr. McDevitt that. They didn't accelerate that any earlier. All this came up four months after the default, four months after the term in the note ended. All of these purported violations of the conditional guarantee. Can I ask back to the conscionability? Both parties were represented by counsel at the time that this guarantee was signed. Is that correct? Correct. And so how doesn't that make it very easy for us, finding that it was not unconscionable when we have sophisticated parties and it doesn't meet the – or the characteristic of at least being procedurally unconscionable? You know, to be honest, we're not going to really argue procedural unconscionability in the sense – I know that's not a really winning argument here, because I think the real truth of the matter is that the unconscionability hinges on violation of the judiciary statute, which this Court does not – frankly, as a matter of law, this Court's decision in Adder Bayes two weeks ago, it affirms you don't have to go any further than that. And with that, we respectfully request that the Court reverse the lower court's decision on grounds that the law on the issue was too serious, or alternatively, that the lower court improperly made determinations of fact and are left for a jury. Thank you. Thank you, counsel. We'll hear from Anthony. Thank you. May it please the Court, Eugene Licker and Althea Daly from Ballard Spar for KLS. Let me see if I can summarize what Judge Lyman found, because the frame of reference is important here. He found that there were two categories out of the six categories of recourse events that had occurred, and they occurred through the conduct of four factual scenarios. He affirmatively denied a summary judgment on one of the bases that we urged, and on the remaining bases, he either granted summary judgment or, in a number of cases, declined to reach the issue because he said he didn't have to. He denied it because of the nondisclosure of the Schwartz agreement, right? The Porter-Wright agreement. The nondisclosure of the Porter-Wright agreement because Porter-Wright sought only 30, whatever it was, less than $50,000 from Sensei, and so it didn't qualify. The judge found that it didn't qualify for that exclusion for either recourse event A or recourse event C. What he did find was one factual scenario fulfilled recourse event A, which is the intentional or willful failure to disclose a material fact in connection with the issuance of the note or while the note was outstanding. He said that was triggered by the failure to disclose, I call it PW just for short, PW's threatened litigation. That's at SPA 69. And then he found, as to all four factual scenarios, that qualified as— Can I ask you about that? I mean, I understand that there are the others, which we'll talk about. But so for the nondisclosure of the threatened lawsuit from Porter-Wright, it has to be an intentional misrepresentation, right? Correct. So why couldn't it be the case that Mr. McDevitt thought, look, it was a year and a half ago, there was this one e-mail where somebody from Porter-Wright said they want to sue you here, but I told them that's not a good idea, but I might change my mind if you don't respond to this e-mail. And then he didn't respond to the e-mail for a year and a half, and they never sued. So wouldn't he—isn't it possible that he concluded that that's not a real threat? Yes, it's possible, but that's not the facts because that e-mail is not the last communication. I don't have the record citation, but we do in our brief. There was ongoing communication for the entire year and a quarter after she sent the e-mail saying we're going to sue you. It's not like it just went away. It's not like nothing happened. Porter-Wright, I forgot the woman's name, but the woman from Porter-Wright kept reaching out to McDevitt, kept telling him you've got to pay, you're making me look bad, this is all bad, you've got to pay, my partners want to sue you. Were there more threats of lawsuits since that initial e-mail when she said my partners want to sue you? Right. The initial e-mail that we cite is the most explicit, and that's why we cite it. But it didn't go away. She kept pressing. She didn't sue. As you know, no lawyer wants to sue a client. So that was the last thing that they wanted to do, but they were serious. I guess I understand. Like maybe that meant that they were serious about it, but isn't it possible to conclude that maybe they weren't serious about it because they threatened to sue a year and a half prior, and then maybe they kept trying to collect on the bills, but they never sued, right? A, it's possible, yes, but that's not what happened. If, in fact, Mr. McDevitt had concluded that it wasn't a real threat and therefore didn't need to be disclosed, would that be an intentional misrepresentation? It could still be an intentional misrepresentation for a couple of reasons. First of all, it doesn't mean that the threat didn't happen. Secondly, you'd have to analyze whether that's a reasonable basis for him to not disclose it. If, in fact, he had reason to think that they had gone away and it wasn't going to happen, if what Your Honor said at the outset happened, which is there's a threat and a year and a half of silence, yeah, I agree, that it would be reasonable for Mr. McDevitt to conclude that the threat had gone away. But that's not what happened. They pursued the claim. They made it known that they were going to pursue the claim. And so whether or not they were actually going to bring the lawsuit, the threat still exists. Your argument is that it is possible that maybe somebody would have concluded it wasn't a real threat. But under these circumstances, no reasonable person could make that conclusion. Correct. Your position? Yes, that's correct. And very importantly, let me take it out of order because So you don't dispute that he would have to understand this is a threat of a lawsuit, and even though it is covered by the agreement, I have decided not to disclose it. That's required to show liability. But you're just saying that there's no dispute of material fact that that's what Mr. McDevitt did. That's correct. What's not required is that Mr. McDevitt have scienter. He doesn't have to know that what he's doing is wrong. All he has to, all that has to happen is I thought that's what I just said. No, no, that's a very important distinction. Okay. And that's how Judge Lyman analyzed it. Mr. McDevitt knew of the threat, knew of the ongoing negotiations, if you will, with Porter Wright, and intentionally did not disclose it. Now, he had a whole bunch of reasons that he gave as to why I thought you said a moment ago that if in fact, I mean, let's just, to illustrate the point, let's say that it was what we said, that it was a threat, and then a year and a half had passed of silence. Right? Just, I understand that you're saying that's not what the record shows, but hypothetically. It's also not what Mr. McDevitt said. No, I understand. But if that's what happened, and Mr. McDevitt just decided, well, that's not a real threat, because it's gone away and they're not going to pursue it after a year and a half, would it still be an intentional misrepresentation if he didn't disclose it? No. No, I think that there is a reasonable You're saying that he does have to know that it's a violation of the agreement, right? No. He doesn't have to know that he's supposed to disclose it. He doesn't have to But I guess if Mr. McDevitt thinks he doesn't need to disclose it, but it turns out that he does. Yes. Doesn't that sound like a negligent misrepresentation? No, it's an intentional misrepresentation. What it isn't is fraud. It's not fraud, but he knows it exists. He makes the decision for whatever reason. He knows it exists, but he thinks that it's not a threatened lawsuit. Except, Your Honor, it's very important to grasp the fact that Mr. McDevitt never maintained that he didn't disclose it because he thought the threat went away. He said, I didn't disclose it because I was going to pay it. I didn't disclose it because it didn't hit the $50,000 threshold, which is for agreements, not for threatened litigation. That's the opposite. I didn't disclose it because I didn't think that they earned the fees. Those are all the reasons. He never said, I didn't disclose it because the threat went away. And he couldn't say that because it's not the record. The record is that he continued to have these conversations. So I guess your argument is not that he doesn't need to show scienter, but there was enough of a showing of scienter here. No. No. I don't. Well, let's say I didn't agree that he didn't need to show scienter. On this record, was there enough evidence of scienter? Is it plausible for him to say, well, I thought that it wasn't covered by the agreement, and that's why I didn't disclose it, and therefore it wasn't an intentional misrepresentation? I don't know. I have not thought about that because scienter is not required. And Judge Lyman was very clear about that. Judge Lyman went through a thorough analysis about why this conduct was intentional. You know what's interesting about Judge Lyman's opinion is he decides that he didn't disclose the Schwartz agreement, right, but says it's not clear that it was an intentional misrepresentation, but I don't need to consider that because the other misrepresentations are enough, right? No, no. It was he didn't rule against us on the Schwartz agreement. He ruled in favor of us on the Schwartz agreement. It was the Porter-Wright agreement that he ruled against us, and it wasn't because of intent. It was because of materiality because it didn't hit the $50,000 threshold. So you're saying that Judge Lyman said that the Schwartz agreement triggered recourse event A-2, the failure to disclose the Schwartz agreement? It triggered C. Can you speak to the criminal usurious argument because that seems to me to be a big one? Yes. This note was for $3.33 million. Since they had, you know, it was obviously in financial, poor financial shape, it couldn't afford to pay the coupon that would be required on a junk bond like this, and so the parties agreed to an original issue discount, substantial, and so. Maybe I should ask the question another way. Why should we not find that this was criminal usurious? Because the note was for more than $2.5 million, and neither the criminal nor the civil usury statute applies to notes in excess of $2.5 million. When you do an original issue discount, what you're really doing is you're borrowing both the principle and the interest, and so what they borrowed was $3.33 million. That's exempt from the usury statute, and this issue was not. Did McDevitt ever get $3.3 million? Yes. He got $2 million. McDevitt didn't, but Sensei did. It got $2 million in cash, and it got $1.33 million worth of interest payments. Can I ask, you know, you found out about, or KLS found out about the Porter Wright litigation and the tax liabilities and the Schwartz litigation, but did not accelerate the loan at that point, right? Continued to just continue to perform under the, or KLS, or sorry, Sensei continued to perform for KLS's benefit under the agreement, and KLS never said this is a material breach, and so therefore we're going to accelerate the loan, right? I think some of those events took place after maturity, but no. We never invoked any default other than the failure to pay at maturity. If you were suing Mr. McDevitt for breach, you know, we might say, well, once a breach occurs, the non-breaching party has the opportunity to continue with the contract or to decide that further performance isn't required, and under these circumstances, you didn't. You continued with the contract, and so why wouldn't a similar analysis apply to the way we understand whether there was a material breach for purposes of the guarantee contract? Because there's a no waiver provision in the guarantee, and there's a no waiver provision in the no purchase agreement. No waiver. That the absence of asserting a right doesn't waive the right. Right, but we still have to determine whether something was material, right? I mean, it's not about whether you've waived it. It's about whether it was material to the parties. Well, yes, for Section 1A recourse event, there's a materiality requirement. For the Section 1C recourse event, it has to be a material breach of a material provision of the contract. But I don't think it necessarily follows that not asserting a breach is a waiver or indicates an absence of materiality. I mean, the only way that this loan was going to get repaid is if Sensei stayed in business, recovered from the awful mismanagement that Mr. McDivitt was doing, and prospered. Well, that's just a way of saying that KLS thought it's more likely to get its money back if Sensei stayed in business and we waited until the maturity date as opposed to accelerating it now. But if KLS had thought that any of these breaches indicated that Sensei was just not going to remain solvent because of these breaches, then it would have accelerated the loan and gotten whatever money it could get out at that time, right? It could have, but the point is you're— So it's your position that actually KLS could have accelerated the loan for any one of these breaches, when it found out about the tax bill or when it found out about the Porter Wright lawsuit or when it found out about the Schwartz lawsuit, it could have said— I'm sorry. That's a default, and therefore we're going to accelerate it now and get our money back. They could have done that, but they knew that if they didn't, it didn't waive the right to declare a default later. And it wasn't because it wasn't material. It was the reason Your Honor said before, that the only way that they're going to get paid back is if Sensei stayed in business. And if they put Sensei out of business, they were going to end up with nothing, which is, by the way, what they ended up with. Can I ask about—you said a moment ago about the recourse of M-3 says material breach of a material term. Yes. To me, just intuitively, it seems like that is a pretty high standard. It has to be—the term has to be material to the contract, and the breach has to be material to the term. And so you could have a non-material breach of a material term, a material breach of a non-material— like all sorts of things could happen, and it wouldn't count. But Judge Lyman seems to think that that means it's a pretty low standard because you could have— it doesn't need to go to the heart of the contract. It could just go to the heart of any term of the contract. Is that right? Why would that be the case? I don't agree that that's what Judge Lyman found. I don't think he ascribed whether it's a high bar or a low bar. He does think it's lower than just saying material breach of the agreement, right? I actually think that the material breach of the agreement would have to— you'd have to show a material breach of a material term. Right. So you think actually when it says material breach of a material term, that is basically the regular materiality standard. Yes. And look, the first material is easy. It's basically binary. You either performed or you didn't perform, at least on all the recourse events that we pointed out. So the real question is whether this is a material term of the contract, and as Judge Lyman pointed out— Why wouldn't the breach have to be material? So if there's some lawsuit that he didn't report, but the lawsuit was only for $5, that can't possibly be a material breach, right? That's correct. There has to be some analysis of the seriousness of the lawsuit that he failed to report. That's correct. But none of the—neither of the two lawsuits that were not reported fall into that category. They were both six figures in a company that had no spare cash. So we're not talking about a $5— Although the Porter Wright one, Mr. McDevitt eventually resolved just with his own funds, right? No, no. So how was that resolved? It's not. There was a default judgment against—there was a judgment against Mr. McDevitt, judgment against Sensay. There's been a receiver appointed who's trying to get money out of Mr. McDevitt, which we're trying to do too. But it was a typical situation where McDevitt kept saying, I'm going to pay, I'm going to pay, I'm going to pay. Trust me. And he's not paid a penny. Okay. So you don't dispute that actually the size of the lawsuit or the seriousness of it is relevant to determine whether there's a material breach. You just think that it's—there's no question that here these were material— Right. I do—I do agree that— It's impossible for Mr. McDevitt to argue, well, the liability that could come from these lawsuits was not significant enough that it would amount to a material breach. Not on these facts. I don't think that's a credible argument. I agree with you that a $5, $10, $100 lawsuit would be immaterial. But none of these are anywhere near that neighborhood. We're way above that. And once again, on a company running on fumes with absolutely zero extra dollars. And look, it all makes sense. This was a very risky investment for KLS. They tried to mitigate the risk in any way that they possibly could. It was an insular company with no track record, no customers. Very difficult—a very difficult loan to make. And so since—I'm sorry, KLS has every right to protect itself. That's what it did. It put in these affirmative and negative covenants. As Judge Lyman pointed out, the guarantee itself helps you figure out what's material. Because it points to a non-exhaustive list of examples, including the negative covenants. That's actually another interesting part about his decision, which is he points out that the agreement specifically lists the negative covenants as material terms. It doesn't mention the affirmative covenants. But he says, oh, but it must—because it includes the negative covenants, it must include the affirmative covenants, right? Right. But why would that be the case? Because the negative covenants are about taking on additional debt or doing anything that would make the company insolvent. The affirmative covenants are like reporting obligations, like about lawsuits and so on. It's not obvious to me that the affirmative obligations are ipso facto more serious than the negative obligations. With all respect, Your Honor, I think that they are the same. The negative covenants prevent the company from taking on burdens to diminish their ability to repay the debt. The affirmative covenants, I've got to tell you about, threaten lawsuits before the closing. They go to the very same thing. Are there things out there that's going to impact this company and its ability to repay this debt? I understand that all parts of the agreement are important. But if the agreement specifically says, lists out the negative covenants and says these are the material terms, and then we infer that the affirmative covenants must also be material terms, doesn't that just mean every term of the contract is—like there's no such thing as a non-material term? In fact, it just covers the waterfront. Well, I don't necessarily— Shouldn't you infer from the specific listing of material terms that those are the terms the parties thought were material at the time? No, Your Honor. I don't agree with the inference that's drawn from the statement, but that's not what the agreement says. It doesn't say these are the material terms. It lists as a non-exhaustive list of examples of material terms. And, yeah, I mean, when you're drafting up a document, you could put in everything, but no one ever does. You put in enough to indicate where you're going, and I, with all respect, think that there's no difference in impact for the negative covenants and the affirmative covenants. They both go to the same thing, protecting chaos's ability to get repaid. What about the provision that just says sensei needs to pay its taxes? Is that—could that be a non-material term? That seems like a boilerplate thing that a lot of agreements just require. You should behave according to the law and pay your obligations. In the context of this deal, it does make sense, because what sensei had been doing over the course of years is collecting the withholding and payroll taxes and not remitting it back to the IRS. And so there was a $300,000 amount due for taxes, and that has two impacts, a financial one and an emotional one. Financially, obviously, if the IRS comes after you and you've got penalties and interest, it's just going to suck out more money from the company. So the promise has to be stop doing what you're doing before. Now you've got to be current on your taxes. But also, KRS is very conscious— But again, you decided on a motion for summary judgment, right? So are you saying it's not even a conceivable position to think it was kind of a standard requirement? There's no question of material fact as to whether this provision was material? I mean, you're saying you're making an argument, given the context of this— even though normally it might be a non-material term, because it might be kind of a boilerplate, in the context of this agreement, it was very important to the parties, and therefore it should be considered material. That kind of sounds like a fact question, doesn't it? I don't think so, Your Honor. First of all, I respectfully don't agree that that provision is not material, just without the context. I'm not even saying that it's not either. I guess my question is, isn't it possible to argue that it's not, and therefore it's a fact question that shouldn't be decided on a motion for summary judgment? Well, Your Honor, I'm reluctant to agree with you that it's possible, even though I do believe it is possible, but it's not possible on these facts. Because what Mr. McDevitt would have to do is argue, have the jury accept a proposition that is totally belied by the situation here. First of all, he never said this is immaterial. And in the context of the $300,000 tax bill that was outstanding, it wasn't immaterial. It was very important to KLS. And those are facts that are in this record, and you can't ignore them. I see I've gone way over. I haven't been able to address a number of issues, but I think we've addressed everything in the briefing except for the usury issue. But once again, we're within an exemption from usury. It was not raised below. I don't really understand how Mr. McDevitt can claim to have raised it below. I've read the section that he points to in the record five times. I don't see it. I'm sorry. I should have turned this off. I don't see it anywhere. They do say that the ‑‑ Well, we do have the discretion to address an argument that's a new argument for a proposition that was raised below, and they did raise the proposition that the agreement was unconscionable, right? They raised the proposition that the agreement was unconscionable, but not because of usury. And so the usury clause, I guess, is another argument that would support that proposition. Right. But it's a separate argument. So we don't always consider such arguments, but we do sometimes. Yeah. And I'm not saying that, you know, if you find that's plain error, that you can't adopt the argument. All I'm saying is that it wasn't raised below. The argument that was raised, the only thing that was said, even remotely touching on the point, was that the borrowing was very expensive. And that's true. And it needed to be expensive because it was very risky, and the proof of that pudding is in the eating. We, KLS, ended up with $0 here. So, but it wasn't raised below. And you've got in your briefing a statement that it was raised below, and I just point out that that's not correct. Thank you, Mr. Looker. Thank you. We'll hear Bottle. Thank you. I first want to address the usury argument and be very clear on the record. At Record Appendix 77, the Secured Convertible Promissory Note Purchase Agreement confirms that to provide operating capital to the company the company desires to sell and purchasers willing to purchase from the company as note an original principal amount of $2 million. That's the purchase price. There is no dispute that $2 million left Apelli's bank account and arrived in Sante's bank account. There is no dispute. There is no $1.3 million that also went to the bank account. $2 million was lent. Whatever Apelli wants to call it, that's $2 million U.S. dollars was lent. They expected $3.3 million in return. Hence, the basis for arguing that this is a black and white on its face violates New York's usury statute, which, again, two weeks ago the Attaway's court confirmed that if a loan on its face violates a statute, it must be void and unenforceable. And then the point about not raising it below, again, Your Honor, I recognize that this is a purely legal analysis. There is no factual determination that needs to be made about it. It's $2 million and $3.3 million plus interest. That's it. That's black and white. There's no factual analysis. The question is, is that violate the statute? And the answer, respectfully, is in the positive. With respect to the Porter Wright issue as brought up, the materiality, I think it's really critical to note that there is a concession that the seriousness of the lawsuit is important. And here again, in a Porter Wright matter, sensei ultimately only paid $15,000. So if the seriousness is to be considered in materiality, then how is a matter of law? Yeah, I'm confused about that. So I thought that actually the Porter Wright lawsuit was settled, but I thought that opposing counsel suggested it was still ongoing. So what is the status of the- There's a collection currently against Mr. McDevitt individually in Texas. So he is currently over a $5 million judgment as a result of this lawsuit that's been cut against him. So you're saying even though there's collections ongoing with respect to him, it can't be material to the company because the company only had this 15,000? Correct. And right now the company doesn't exist. The company hasn't existed since 2019. So when you attempt to say the value now is accelerated, the company doesn't exist now. They foreclosed on that. So they had to understand the materiality based on when the alleged breach happened, right? Certainly. And it's against Mr. McDevitt individually, personally, which is occurring right now. And finally, it should be noted, again, the whole acceleration issue that Your Honor brought up, keeping in mind that during the two years when these issues were arising, there was an acceleration of note which seems to suggest at least an issue of fact as to whether KLS, or I should say that Pelley, believed those to be material breaches. They didn't believe they were material breaches until after, since they didn't repay the loan. They didn't believe they were material breaches until a lawsuit was filed against Mr. McDevitt personally. I think that's critical, and Judge Lyman disregarded that in the lower court. So with respect to our position, we argue, or we repress this court, find that the loan be in violation of New York's usury statutes and deemed void and unenforceable. And alternatively, if not deemed void, respect that the lower court's decision be reversed on grounds that summary judgment was inappropriate as a matter of law. Thank you both. Thank you. We'll take the matter under advice. That's the last argument in the calendar for today. So I'll ask the Court of the Deputy to adjourn. Court is adjourned.